Fessler's Appeal.   May's Appeal.

1. May had a contract for land with Mackey; Fessler agreed to pay the purchase-money due at times named, the title to be made to Fessler to be by him held until the purchase-money should be repaid him by May in logs, according to a contract made at the same time, and upon repayment to convey to May. *Held*, to be a mortgage of May's equitable title to Fessler.

2. Mackey had contracted in writing to convey the land to May upon certain payments to be made by a given time. This was an agreement of bargain and sale, time being of the essence of the payment; until the time had expired the agreement was binding.

3. If it were an option-contract it was enforceable, if the option were exercised according to its terms.

4. Fessler's contract with May recited the contract with Mackey; Fessler paid the purchase-money to Mackey and took the deed. *Held*, that he was estopped from denying May's title.

[Fessler's Appeal.]

5. Fessler by the log contract was to pay $500 to May on account of the logs, in twelve days; by failing to pay, May was deprived of the means of cutting and delivering the logs as he had stipulated. *Held*, that Fessler could not set up the log contract as a defence to May's claim under the mortgage.

6. Fessler sold by articles to Harris; before Harris paid the purchase-money and got the deed, a bill by May against him and Fessler was served on him. This was notice of May's title and he could not set up the deed made afterwards by Fessler as defence against May

7. May's bill was against Fessler, Harris and others; the prayers were that Fessler convey to May and account for the logs; that the other defendants be restrained from setting up title to the land, from cutting timber, &c., and for general relief. The title being in Fessler at the filing of the bill a prayer for a conveyance from Harris was unnecessary.

8. Harris having afterwards conveyed the land; compensation was properly decreed against him.

9. A bill in equity is *lis pendens* of which every one is bound to take notice.

March 24th 1874. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

Appeals from the Court of Common Pleas of *Cameron county:* In Equity: No. 282 and 447, to January Term 1872.

On the 6th of May 1867, Henry W. May filed a bill against P. G. Fessler, N. C. Harris, A. H. Spaulding, C. Hunsicker, George Perry, David McCraney and Samuel McCraney. The bill set out:—

1. Plaintiff on September 11th 1863 owned a tract of timber land on Loshbaugh run, in Cameron county, being part of a tract warranted to William Willink, containing about 600 acres, which tract he owned under an agreement with L. A. Mackey and D. Carskaddon, and on the contract he owed to his vendors $1100.

2. Fessler, the defendant, wishing to purchase logs to be cut from the land, plaintiff entered into a written contract with him on the 11th of September 1863, Fessler to pay plaintiff $500 in twelve days and $600 more in eighty days, to be applied to the payment of the amount due to Mackey and Carskaddon for the purchase-money of the land; and when this money should be fully paid the deed to be made to Fessler, who was to hold the title as collateral security until the $1100 should be repaid in logs to be cut from the land by the plaintiff and delivered to Fessler, who agreed upon such repayment to reconvey the land to the plaintiff. This agreement, "A," was made part of the bill.

3. On the same day plaintiff made another agreement with Fessler, in which the first agreement is referred to, and by which plaintiff agreed to sell to Fessler from the land 1,000,000 feet or more of logs, and deliver them on Loshbaugh run, Fessler to pay at the rate of $5.25 per thousand feet, to be paid, $500 in twelve days, and $1.50 per thousand feet as fast as the logs were delivered, $1 per thousand feet to be paid monthly, from the 1st day of January 1864, 75 cents per thousand feet when the drive of the

logs should start, and for the balance, after deducting the amount to be paid to Mackay and Carskaddon, Fessler to give plaintiff his note, payable in four months from the time the drive should start. This agreement, "B," was made part of the bill.

4. Shortly afterwards Fessler paid Mackey and Carskaddon $500, and then, for the purpose of carrying out agreement "A," the contract between plaintiff and Mackey and Carskaddon was, by the consent of all parties in interest, destroyed, and a new contract was made between Fessler and plaintiff for the purpose still of carrying out agreement "A," whereby Mackey and Carskaddon agreed, on the payment of the remaining $600 due on their contract with plaintiff, to convey the land to Fessler; he afterwards paid the $600; the land was conveyed to him and he held the legal title.

5. Plaintiff had always been ready to perform his part of agreement "B" on being paid for the logs according to its terms, and in the performance the agreement to repay to Fessler the $1100 paid by him to Mackay and Carskaddon.

6. Fessler, shortly after contract "B" was made, paid $250 on account of it, and although often requested, paid no more until April 1864, when he paid $250 more; but the plaintiff, notwithstanding, being anxious and ready to carry out his part of the contract, continued until January 1864 to cut and get the logs into the creek, to his great inconvenience and damage, on account of Fessler's failure to comply with his agreement; up to that time he had delivered 61,300 feet of logs, when he demanded payment for them, and was refused by Fessler; plaintiff then offered to pay Fessler all the money advanced for plaintiff if he would let plaintiff have the title to the land and logs; this, also, Fessler refused; plaintiff then resumed work in getting the logs at great disadvantage and loss, on account of Fessler's refusal to pay him, and continued-so to work until March 1st 1864, when he had delivered 180,950 feet of logs in the run, all which Fessler claimed and received, but had refused to comply with the terms of the contract.

7. Fessler claimed the land and logs as his own, and denied that the plaintiff had any right, title, interest or claim in the same.

8. By reason of Fessler's refusal to make his payments, the plaintiff was compelled to discontinue getting the logs into the creek for want of means to carry on so expensive a work, but was still willing and ready to complete the work on the performance by Fessler of his agreement.

9. The defendant caused agreement "A" to be recorded on the 12th of February 1864, for security for himself and notice to others, and had frequently, by verbal and written notices, informed the defendants of the agreement "A" before they began to cut

timber, yet the defendants, P. G. Fessler, N. C. Harris, A. H. Spaulding, C. Hunsicker, George Perry, David McCraney and Samuel McCraney, had entered into possession of the land, and were cutting and taking timber from it.

The prayers were :—

1. That Fessler be required to account for the logs delivered to him under article " B," and pay the plaintiff for them as well as for the damages he had sustained by the violation of the contract by Fessler.

2. That Fessler be compelled to convey the land to the plaintiff on payment to him of the advancements made for the plaintiff should anything be found due.

3. That the defendants be restrained from setting up title to the land, and from cutting or removing timber, &c., and that they be required to deliver to the plaintiff all the timber cut.

4. That they be required to account for all the timber cut by them, &c., and for all damages done, &c.·

5. For further and general relief.

The agreements were as follows :—

" A." This agreement, made this 11th day of September 1863, between P. G. Fessler and H. W. May—Witnesseth : That whereas the said H. W. May holds an agreement with L. A. Mackey and D. Carskaddon, for a tract of land on Loshbaugh Run in Cameron county. Now this is to show that the said P. G. Fessler agrees to make a certain payment of five hundred dollars to the said May, to apply on the said land, in twelve days, also, a further payment of six hundred dollars in eighty-six days from this date, and it is agreed and understood, that the title of said land shall be made to the said Fessler, and be by him held until the eleven hundred dollars shall be paid by the said May to the said Fessler, in saw-logs, as per terms stated in a contract for logs this day made between the parties. Then the said Fessler agrees by himself, his heirs and assigns, to convey to the said May, his heirs or assigns, the said tract of land free from encumbrance. In witness whereof, the parties have placed their hands and seals.　.

"P. G. FESSLER.　[L. S.]
"H. W. MAY."　[L. S.]

" B." Agreement made the 11th day of September, A. D. 1863, between H. W. May, of Wharton township, Potter county, and state of Pennsylvania. of the first part, and P. G. Fessler, of Williamsport, Lycoming county, and state aforesaid, of the second part, as follows :—

" The said party of the first part hereby agrees to sell and deliver to the said party of the second part as hereinafter specified, one million or more feet of merchantable white pine saw-logs, board measure ; said logs to be well butted off ; free from shakes or other

defects, and not to run further into tops than to make good merchantable lumber. * * *

"It is understood that said logs are to be cut during the coming fall and winter, and to be hauled into Loshbaugh Run below Herdic's job, in such manner as to be safe from ice floods, &c., and at suitable places for floating out of said stream, and all to be done in time for the first floods next spring, suitable for driving logs out of said stream. * * *

"In consideration of which, the said party of the second part hereby agrees to pay to the party of the first part five dollars and twenty-five cents per thousand feet, board measure, for all logs scaled and accepted, by the man to be sent as aforesaid and so delivered in the stream as aforesaid as follows:—

"Five hundred dollars within twelve days, one dollar and fifty cents per M. feet when delivered in the above said run, one dollar per M. feet, payable monthly from the 1st of January, and seventy-five cents per M. feet when the drive starts, and the balance in my notes of four months from the time the drive starts. (The payments on the land are to come out of the two last payments.)"

Fessler answer was:—

1. Plaintiff never had any interest in the land except as thereafter stated.

2. Plaintiff, in September 1863, told Fessler that he had the refusal of the land, and wished Fessler to buy logs and advance him money to enable him to pay for the land; the agreement "B" was then made; Fessler had no recollection of agreement "A." Fessler was to buy the land, and if plaintiff complied with his contract as to the logs, Fessler was to convey the land to plaintiff; there was no agreement that Fessler should hold the land as collateral security, and convey to plaintiff on being repaid the purchase-money.

3. Afterward Mackey, by agreement "C" attached to the answer, agreed to sell and convey the land to Fessler; this agreement being "independent of any agreement of refusal of the land" made with plaintiff. Mackey refused to sell the land to plaintiff, unless he would pay or secure the purchase-money, as plaintiff was "totally insolvent."

4. Plaintiff failed to get out the logs acccording to his contract. He was to get out 1,000,000 before he could claim any part of the price, except $500 which Fessler paid.

5. Plaintiff never delivered any logs to Fessler except about 30,000 feet, and he "afterwards refused to carry out his agreement and abandoned the job."

6, 7. Plaintiff tried to sell some of the logs in fraud of his agreement; he had logs in the woods which he never delivered; and by his failure to perform the contract Fessler suffered great damage.

8. Plaintiff never offered to pay Fessler $11,000 or any part for the amount paid Mackey.

9. Fessler did not receive the deed until January 4th 1865, when all agreements between him and plaintiff were at an end.

10. Fessler sold the land September 14th 1866, by articles ("D." attached to answer), to N. C. Harris, who had paid him $1000 and taken possession.   The equitable title was not then in Fessler, nor at the filing of the bill, and he had no interest in the land except as to the balance of the purchase-money.

11. Fessler never acknowledged any agreement with the plaintiff, there was no subscribing witness to the agreement "A," and Fessler did not authorize its being recorded.

12. Fessler had not been in possession of the land since September 1866, and had not taken away any timber, the land having before that time been sold to Harris.

The agreements referred to in the answer were:—

"C." Know all men by these presents, that, for and in consideration of the sum of $475, to L. A. Mackey paid by P. G. Fessler, the receipt, &c., and upon the further payment by the said P. G. Fessler, of the sum of $482.75 within three months from the date hereof, I do covenant, &c., to sell and convey to him, his heirs or assigns, or to such party or parties as he may designate, free from encumbrances, the tract or tracts of land situate in the township of Grove, in the county of Cameron, as follows : No. 4940, 495 acres, south part, Wilhelm Willink and others, warrantee, it being all that part of said tract of land formerly situate in Clinton county, and purchased by me at treasurer's sale, in said county, in 1850 ; and upon failure to pay the sum last above mentioned within the time above specified, then this agreement to be null and void between both parties.

"L. A. MACKEY, [L. S.]"

September 19th 1863.

"D." Agreement, made and concluded on this 14th day of September, A. D. 1866, between Philip G. Fessler, of, &c., and N. C. Harris, of, &c., witnesseth that, for the consideration hereinafter mentioned, the said party of the first part agrees to sell and convey to the said party of the second part, his heirs and assigns, all that certain tract of unseated land situated in Cameron county, Pa., formerly in Grove township, Clinton county, surveyed on a warrant granted to Wilhelm Willink and others, on the 3d day of February, A. D. 1794, numbered 4940, containing 495 acres, more or less, it being all that part of said tract lying in Clinton county previous to the erection of Cameron county, and being the same tract of land conveyed by deed, dated January 4th 1865, by Wm. Feeron and Eliza his wife, to the party of the first part, in consideration whereof the said party of the second part, &c., agrees to pay the said party of the first part, &c., $2000, as follows, to wit: $1000 on the execution of this agreement, and the remaining $1000 in

one year from the execution of this agreement, with interest. On the payment of the purchase-money, the said party of the first part binds himself; his heirs and assigns, to execute and deliver to the said party of the second part, his heirs or assigns, a warrantee deed for the above-described tract of land, clear of all encumbrances; and in case that security is given, then the said party of the first part will execute and deliver a deed whenever required by the said party of the second part.

"Witness our hands and seals, September 14th, A. D. 1867.

"P. G. FESSLER, [L. S.]
"N. C. HARRIS, [L. S.]"

In presence of Henry W. Watson.

"Received, Williamsport, September 14th 1866, of N. C. Harris, his check, payable to my order, on First National Bank of Athens, for $1000, which, when paid, will be in full of the first payment herein mentioned.                           "HENRY W. WATSON,

"Attorney for P. G. Fessler."

N. C. Harris answered :—

1. He had no knowledge of plaintiff having been owner of the land, but believed that he never had been.

2. He had no knowledge of agreement " A" and denied that plaintiff had any interest in the land on the 11th of September 1863 ; Mackey and Carskaddon had the title and they were under no obligation to convey to plaintiff, who had never bound himself to pay any of the purchase-money; nor had he paid any of it: on the 4th of January 1865, Mackey and Carskaddon conveyed the land to Fessler and Fessler sold it to Harris, by articles dated September 14th 1866, for $2000 of which $1000 were then paid; $1000 being still unpaid. A copy of the article marked "E" was attached to this answer.

4. He believed that the conveyance from Mackey and Carskaddon to Fessler was not in pursuance of an agreement between plaintiff and Fessler or Mackey and Carskaddon; he denied that there ever had been any contract between plaintiff and Mackey and Carskaddon, for the purchase of the land, or that Mackey and Carskaddon were under any obligation to convey the land to the plaintiff; and that when the land was conveyed to Fessler, the plaintiff had any interest in it.

The answer then denied under belief, that plaintiff had complied with contract "B," &c., for the delivery of the logs to Fessler, &c.

9. Harris denied knowledge of the recording of agreement " A ;"—he denied having any notice of the agreements. After he purchased from Fessler, he entered on the land and employed others to cut timber for him and take it to market; the Craneys, defendants, worked for him but neither they nor Hunsicker who

superintended the cutting, had any interest in the land or the timber; Perry and Spaulding had no interest in the land or timber.

Agreement "E." was as set out in the answer of Harris.

By a supplementary answer, Harris averred that he had employed George Perry to make inquiry as to the title, &c., and was informed by him that Fessler owned the land and upon that inforformation he purchased from Fessler and then knew of no claim from any other person;—after he had taken possession and commenced cutting timber, plaintiff forbade his cutting and notified him of his claim, in March or April 1867, a short time before filing the bill; Harris upon inquiry from Perry, Fessler and Carskaddon was informed by them, that plaintiff never had any title or claim to the land, that he had not paid Mackey and Carskaddon for the land nor was he indebted to them for it. Harris had taken logs from this land and another tract adjoining together about 1,093,000 feet and about one-half of this amount was taken from the lot claimed by plaintiff, amounting to about 500,000 and 600,000 feet.

An examiner was appointed who took a large amount of testimony in the case. Afterwards B. S. Bentley, Esq., was appointed master. In his findings, and in the opinion of C. J. Agnew, the facts sufficiently appear.

The master reported :—

"1. On the 11th day of September 1863, Henry W. May, plaintiff, held an agreement in writing from Mackey and Carskaddon, in which they had obligated themselves to convey to him the land described in plaintiff's bill, upon his paying to them the amount therein stipulated, at the time stipulated, which agreement was in full force and effect on the day aforesaid, and by which Henry W. May had an equitable interest in the land that he could sell, mortgage or otherwise dispose of; the facts set forth in first paragraph of plaintiff's bill are true.

" 2. For the purpose of raising means to pay for the said lands, he entered into the agreement with P. G. Fessler, as contained in the two papers, marked 'A' and 'B.' Said two papers, bearing date September 11th 1863, were executed by the parties simultaneously, and are to be construed together as constituting one agreement. Therein P. G. Fessler agreed to pay to Mackey and Carskaddon the amount going to them from Henry W. May as purchase-money on the land, being $1100, or thereabouts, and upon the repayment to him in saw-logs, in the manner provided for in the agreement, he agreed to convey the land to Henry W. May, his heirs and assigns. Henry W. May agreed on his part to cut, sell and deliver to P. G. Fessler one million feet or more white pine logs, at $5.25 per thousand feet, within the time and in the manner particularly set forth in the agreement. And P. G. Fessler agreed to pay for the logs $500, within twelve days from the

date of the agreement. $1.50 per thousand feet when delivered in the Run, designated in the agreement, the balance to be paid as in the agreement provided for, and the payments made on the land to Mackey and Carskaddon should be taken from the last two payments, and the facts set forth in paragraphs 2, 3 and 4 of plaintiff's bill are true.

"III. In pursuance of the agreement, Henry W. May commenced cutting and hauling logs, on or about November 1st 1863, and up to January 28th 1864, he cut and delivered 60,300 feet. Upon his delivering the logs, there would have been due to H. W. May, according to the agreement, as follows :—

| | |
|---|---|
| "To be paid within twelve days from Sept. 11th 1863, | $500.00 |
| "   "   " $1.50 per thousand delivered in Run, being $1.50 on 60,300 ft. so delivered,   -   - | 90.45 |
| | $590.45 |

"IV. P. G. Fessler did not pay $500 within twelve days from the date of the agreement, nor at any time thereafter up to the 28th of Jan. 1864, nor did he pay $1.50 per 'M.' for the 60,300 ft. delivered in the Run previously to Jan. 28th 1864. But he did pay Sept. 21st 1863, part of the $500, to wit:   -   -   - $250

"Also, $5 sometime in January 1864, -   -   -   5

—— $255.00

"Thus leaving due to Henry W. May, Jan. 28th 1864, from P. G. Fessler, according to their agreement, -   -   -   -   -   -   -   -   $335.45

'V. On the 19th day of September 1863, P. G. Fessler obtained from Mackey and Carskaddon an agreement for the land. This agreement was to the same import and upon the same terms as the one held by Henry W. May from them, and the agreement was obtained by P. G. Fessler in the presence of and with the consent of Henry W. May, and in furtherance of the agreement made between them September 11th 1863.

"VI. P. G. Fessler paid to Mackey and Carskaddon, on the 19th day of Sept. 1863,   -   -   -   - $475.00

"And on the 6th day of Jan. 1865, he took a deed for the land, in his own name, from William Fearon, trustee of Mackey and Carskaddon, and then paid the balance due on the contract, to wit :   -   - $482.75

"Total paid by P. G. Fessler on the land,   - $957.75

"VII. On the 14th day of September 1866, P. G. Fessler sold the land to N. C. Harris, one of the defendants, by contract. N. C. Harris paid, upon the execution of contract, $1000 to P. G. Fessler, and also agreed to pay him $1000 more within one year from the date of the contract. He also paid to George Perry $500 for his services in the sale and purchase of the property, between P. G. Fessler and N. C. Harris, making $2500 paid and agreed to be paid by N. C. Harris for the land.

"VIII. Prior to the purchase by N. C. Harris, he had employed George Perry to make inquiry as to the title and price of the land. George Perry did make inquiries. He knew that May was cutting logs on the land. He saw the agreement between P. G. Fessler and Henry W. May. He had conversation with Carskaddon in relation to May's interest in the land, but did not go to May to make inquiries of him. After the payment of $1000 by N. C. Harris on his contract, notice was given to George Perry, while he and others were at work on the land cutting logs for N. C. Harris, by Henry W. May, that the logs they were cutting would be held by him when they reached the boom. Before N. C. Harris paid the last $1000 to P. G. Fessler, on his contract, the plaintiff's bill had been served on him, giving him full notice of plaintiff's claim. The allegation that personal notice was given by Henry W. May to N. C. Harris, in the fall of 1866, while Harris was negotiating with Fessler, is denied by N. C. Harris, and the allegation is not sustained. The parol evidence of the recording of the contract is insufficient to raise the question of notice, as it is not shown that the contract was acknowledged, or that it was properly recorded, and P. G. Fessler makes oath that it never was acknowledged by him, and there were no subscribing witnesses.

IX. Warrant 4940, mentioned in the first paragraph of plaintiff's bill, was divided east and west by the Potter and Cameron county line. The part thereof purchased by the said N. C. Harris, and claimed by the plaintiff, is in the county of Cameron, and south of the said line. N. C. Harris also purchased the part of said warrant lying in Potter county, of other parties. The part lying in Cameron county contained a larger number of acres, and had more timber growing upon it than the part in Potter county. N. C. Harris sold, and by deed bearing date the 22d day of September 1868, after service of plaintiff's bill on him, conveyed the undivided half of the warrant to F. N. Page, for a house and lot situate in Athens, Bradford county, Pennsylvania, valued by the parties at $15,000, which I find to be the fair value thereof. He sold the other undivided half of the said warrant to F. L. Wells, for the consideration of $15,000 as mentioned in the deed from N. C. Harris to F. L. Wells, bearing date the 24th day of April 1869, and that there is no evidence of the said Harris having expended any money in making improvements before the sales on said lands.

[Fessler's Appeal.]

"X. N. C. Harris cut and took from the lands, before he made sale thereof, at least 1,093,000 feet of white pine, worth $3 per thousand feet.

"XI. Henry W. May, on the 11th day of September 1863, had not the means to pay Mackey and Carskaddon for the land. He had not the means in himself to cut and deliver the logs to P. G. Fessler, in accordance with his contract, and it was for the want of such means, the same not being furnished by P. G. Fessler, that he did not go on with the job and fulfil his agreement.

"XII. The plaintiff went at different times to P. G. Fessler during the month of January 1864, to get money, alleging he could not get out the logs unless he could get money; and alleging there was money due him. He offered to pay to P. G. Fessler all the moneys he had advanced on the contract if he would give up or vacate said contracts, and that said Fessler refused.

"XIII. P. G. Fessler paid on his contract with May as follows:—

| | | |
|---|---|---|
| September 21st 1863, paid to Henry W. May, | - - | $250.00 |
| January 1864, " " " " | - - | 5.00 |
| April 4th 1864, " " " " | - - | 250.00 |
| September 19th 1863, paid to Mackey and Carskaddon, on land, - - - - | - | 475.00 |
| January 4th 1865, paid to Mackey and Carskaddon, on land, - - - - | - | 482.75 |
| | | $1462.75" |

| | | |
|---|---|---|
| He received 60,300 feet of logs on contract at $5.25 per thousand, - - - - | - | $316.50 |
| Also, from N. C. Harris, on contract for sale of land to him, September 14th 1866, - - | - | 2000.00 |
| | | $2316.50 |
| Deduct amount paid as above, - - | - | 1462.75 |
| | | |
| Amount received over amount paid, - | - | $853.75 |

"XIV. The amount of timber taken from the land claimed by plaintiff was 666,667 feet.

| | | |
|---|---|---|
| This, at $3 per thousand, would give | - | $2000.00 |
| He also received, on sale of lands to F. N. Page, house and lot valued at - - - | | 15,000.00 |
| | | $17.000.00 |

N. C. Harris paid to Fessler $2000.

Received beyond what he paid, $15,000.

\*        \*        \*        \*        \*        \*

"I find the following legal conclusions from bill, answers and evidence:—

\*        \*        \*        \*        \*        \*

[Fessler's Appeal.]

"II. The agreement of Mackey and Carskaddon to sell, and upon payment of the purchase-money, to convey the land to Henry W. May, as contained in the first finding of fact, was a valid agreement, and binding upon them, and under it the plaintiff had an equitable interest in the land on the 11th day of September 1863, that he could sell, mortgage or otherwise dispose of.

"III. The arrangement and agreement between Henry W. May and P. G. Fessler, entered into on the 11th day of September 1863, was either a sale of plaintiff's interest in the land, or a mortgage, security or pledge thereof, for the performance of some act. That it was not intended as an absolute sale is evident from the terms of the agreement and the situation of the parties. Nor was it a *conditional* sale. P. G. Fessler had no interest in the land that he agreed to part with to Henry W. May, upon certain conditions to be performed by him. In a conditional sale the estate *reverts* to the vendor, upon non-performance of conditions. This was not the case between Fessler and May. May was the equitable owner of the land. To complete the title, and save his equitable estate, the purchase-money must be paid. May had not the money to pay, but as is frequently the case, he was willing to put the land in pledge to secure an advancement of the purchase-money. He entered into an agreement with P. G. Fessler to advance the money, and to take and hold the title until he should be reimbursed the money he should have advanced. It is true that May agreed to pay in saw-logs, at a particular price, and he also agreed to get out a much larger quantity at a particular price, and to be delivered within a specified time, than was necessary to repay Fessler the money he was to advance upon the lands. Whether he was to get his pay in saw-logs, or in some other way, is immaterial.

"There is more in *substance* than in a *name*. The arrangement of the parties as contained in their agreements of September 11th 1863, I hold to be in the nature of an imperfect or equitable mortgage, security or pledge. We may call it what we please—its character remains the same; it was a security coupled with a trust. Fessler was to advance the money and take the title in his own name, and to hold in trust for May, until May should reimburse him, and then to convey to him in fee.

"It is claimed, however, on the part of the defendants, that admitting it to be a security, mortgage or pledge, it was a pledge for the performance of the entire contract on the part of May, and that he could have no claim in equity without showing an entire performance. I do not assent to this; I think the security was only for advancements to be made by P. G. Fessler. That at any time, without the delivery of a single saw-log, upon paying to Fessler the money he had advanced in pursuance of the agreement, and interest, May would have been entitled to a conveyance of

[Fessler's Appeal.]

the land from Fessler, and a court of equity would have decreed such conveyance, leaving to the parties their common-law remedies for other breaches of the agreement. The transaction being, then, in the nature of a mortgage or security, there could be no forfeiture of estate, and no change in the relation of the parties, *except by agreement of parties*, or by proceedings in equity and decree of sale.

"IV. That even if there be error in the foregoing conclusion, it would not relieve the defendants. I construe the agreements of September 11th 1863, that Fessler shall not only pay to Mackey and Carskaddon $500 on the land, within twelve days, but that he shall also pay $500 towards the logs, within twelve days, and that he shall also pay $1.50 per thousand feet so fast as May shall deliver the logs in the stream. This, he did not do, and as a consequence thereof May could not and was not under obligations to go on with the contract.

"V. That the contract obtained by P. G. Fessler from Mackey and Carskaddon, on the 19th day of September 1863, was obtained in pursuance of the agreement of September 11th 1863, and was held in trust by P. G. Fessler for Henry W. May.

"VI. That P. G. Fessler was bound to accept the offer made by May, and others on his behalf, and to take the money he had advanced on land and logs, and to assign the contract he held from Mackey and Carskaddon for the land, and to vacate or annul the contract he had made with May (he, Fessler, having failed to perform his part); and having refused to accept the offer, and claiming the land as his, it was not necessary for May to make a tender of the balance that might be due to Fessler after deducting what logs he had received, before filing his bill. The refusal to do anything about it obviated the necessity of a tender as regards the plaintiff's right to support his bill.

"VII. That George Perry was the agent of N. C. Harris in looking up the title to the land. That George Perry had notice, prior to the purchase of the land by the said N. C. Harris, and while he was acting for him in relation to the purchase thereof, sufficient to put him upon inquiry of May; and that N. C. Harris, as principal, was affected by such notice to Perry.

"VIII. That N. C. Harris, having purchased the land of Fessler, after notice to George Perry, his agent in the transaction, stood in no better situation than did P. G. Fessler himself, and would hold the land in trust for May, upon the same conditions that Fessler held it.

"IX. That in case there be error in the 7th conclusion of law, it could have no effect except as to the $1000, for before anything farther was paid by the said N. C. Harris, the plaintiff's bill was served on him, which was full and direct notice to him of the plaintiff's claim. The bill having been served on him November

25 P. F. SMITH—32

23d 1867, he could have protected himself against any farther payment to Fessler, and he would have been protected as to the $1000 paid, provided he had been a bonâ fide purchaser, without notice.    But the result will show that he is protected in either case.

"X.  That if P. G. Fessler held the land in security, as hereinbefore stated, he could convey no better title to any other person with notice, than he held himself.    He could at any time have brought his bill against May, and procured a decree for the sale of the land, and thus have cut off May's equity.    This he was bound to do unless by agreement with May—'Once a mortgage, always a mortgage.'

"XI.  That the sale and conveyance of the land by N. C. Harris, while the case was pending, and after service of plaintiff's bill upon him, for a house and lot valued at $15,000, enures to the benefit of the plaintiff, and the said N. C. Harris can take no advantage thereby.    It was *mala fides* in him after service of bill upon him to put it out of his power to comply with the decree for specific performance prayed for, and he must therefore respond in damages under plaintiff's general prayer for relief.

\*          \*          \*          \*          \*          \*          \*          \*

"XIV.  That P. G. Fessler is bound to account to the plaintiff for $853.75, being the amount received by him beyond the amount advanced by him, with interest thereon from September 14th 1866, the day of sale of the lands to N. C. Harris by the said P. G. Fessler.

"XV.  That N. C. Harris is bound to account to the plaintiff for $15,000, being the amount received by him in house and lot and timber, over and above the amount paid by him to P. G. Fessler, with interest thereon from the 10th day of January 1869, being about the proper average of time between the dates of sales to Page and Wells by the said N. C. Harris.

"XVI.  That the conduct of the plaintiff has not been free from objection in the transaction.    He slept upon his rights for three years.    He made no tender to P. G. Fessler, before filing his bill, of the money that had been advanced by him.    From these facts, and other evidence in the case, I deem it equitable that he should not recover costs, and that he should pay the one-half thereof, and that P. G. Fessler and N. C. Harris should pay the other half thereof."

He reported this decree:—

"It is therefore ordered, adjudged and decreed, that the defendant P. G. Fessler pay unto Henry W. May, the plaintiff, $853.75, within sixty days from the service of notice upon him of the final confirmation of this decree, and interest thereon from the 14th day of September 1866.    And that the said N. C. Harris pay unto Henry W. May, the plaintiff, within four months from the final confirmation of this decree, $15,000 and interest thereon till paid, from the 10th day of January 1869.

[Fessler's Appeal.]

" That the plaintiff pay the one-half of all costs, and that P. G. Fessler and N. C. Harris pay the other half thereof."

Both parties filed exceptions to the report.    After argument, The court (Williams, J.), in concluding his opinion, said :—

" The bill made a case against Fessler for conveyance under the evidence.    We decree compensation, but the bill made no case against Harris, except for an injunction and account.    As no conveyance from him is asked, none can be decreed.    No facts are alleged in the bill which could sustain such a prayer for relief, if made, and for that reason the prayer for general relief will not justify the decree recommended, so far as it relates to Harris. From this view it follows that we sustain such of the exceptions to the master's report as relate to the decree against Harris, and such as relate to the decree against Fessler are overruled."

A decree was entered in accordance with this conclusion.

Both parties appealed to the Supreme Court, assigning for error respectively the parts of the decree against them.

*H. W. Patrick* and *H. W. Watson*, for Fessler and Harris.— The construction of the contracts is doubtful, and equity will not entertain the bill, but leave the plaintiff to his remedy at law : Callaghan *v.* Callaghan, 8 Cl. & Fin. 374 ; Charnley *v.* Hansbury, 1 Harris 21 ; Waters *v.* Howard, 8 Gill 277.    The remedy at law was adequate : Fry on Specific Perf., sect. 12, p. 34 ; N. Penn'a Coal Co. *v.* Snowden, 6 Wright 488 ; Daniels's Chan. Pr. 610 ; Each must have a right to compel specific performance or neither had : Bodine *v.* Glading, 9 Harris 53 ; Fry on Specific Perf., sect. 39, p. 30.    The plaintiff is not entitled to performance because of his laches by reason of his delay : Fry on Specific Perf. sect. 737, p. 219 ; Tiernan *v.* Roland, 3 Harris 438 ; Greenlee *v.* Greenlee, 10 Id. 235 ; Germantown Pass. R. R. Co. *v.* Fitler, 10 P. F. Smith 133.    The land having been sold specific performance could not be decreed and damages in such case will not be awarded : 2 Story's Eq. J. sect. 793.    When several instruments are made at the same time about the same matter they are to be construed as one instrument : 2 Washburne on Real Prop. 481. May had no interest that could be mortgaged ; the contract was one-sided : Boston & Maine R. R. *v.* Bartlett, 3 Cushing 227 ; Russell's Appeal, 3 Harris 322 ; Kerr *v.* Gilmore, 6 Watts 407 ; Stoever *v.* Stoever, 9 S. & R. 447 ; Rickert *v.* Madeira, 1 Rawle 327.    A conveyance is not a mortgage unless the grantee designed to make a loan on it as security, 2 Washburn on Real Prop. 492, and the debt could be enforced : Id. 482.    This was a conditional sale : Flagg *v.* Mann, 14 Pickering 467.    The party agreeing to convey must derive his title from the other party : 2 Washburn on Real Prop. 47.

*S. D. Ball* and *R. P. Allen*, for May.—The previous contract

between May and Mackey and Carskaddon, is to be considered with contract marked "A," as well as the acts of the parties subsequent to those agreements and contemplated by the parties when the same were entered into : Chit. on Con. 89 ; Phila. Life Ins. Co. *v.* American Life and Health Ins. Co., 11 Harris 65. What is agreed to be done, is, in equity, looked upon as actually done : Br. Eq. sect. 245.

There was an election to take the land by May on the 11th of September 1863, which as between May and Fessler, gave May an *estate* in the land that could be mortgaged, and the actual acceptance of the land by May through Fessler as his agent, trustee or mortgagee, on the 19th day of September 1863, according to their agreement of the 11th of the same month, gave May a mortgageable estate in the land : Kerr *v.* Day, 2 Harris 112 ; Daniels *v.* Davidson, 16 Vesey 253 ; Elder *v.* Robinson, 7 Harris 364 ; Corson *v.* Mulvany, 13 Wright 88.

May's contract of refusal or option with Mackey and Carskaddon was valid, although signed by them only, the same as if it had also been signed by May : Lowry *v.* Mehaffy, 10 Watts 387 ; Shoofstall *v.* Adams, 2 Grant 209 ; McFarson's Appeal, 1 Jones 503 ; Tripp *v.* Bishop, 6 P. F. Smith 424. By his agreement Fessler so used May's right to the land as through it to get possession of the title as was agreed to hold for May, and he cannot now turn round and deny May's right entirely, and claim to hold the land for himself. This is a perfect estoppel from his setting up title to the land for himself : Adam's Eq. 151 ; 1 Story's Eq., § 391 ; Hill *v.* Epley, 7 Casey 331 ; Nerhooth *v.* Althouse, 8 Watts 427 ; Hipple *v.* Rice, 4 Casey 406 ; Meason *v.* Kaine, 17 P. F. Smith 126. Wherever it is legally proved that a conveyance was made for the purpose of security, equity regards and treats it as a mortgage : 2 Wash. on Real Prop. 44 and note. Whether covenants in an agreement are dependent or independent is to be determined by the intention of the parties, as it appears on the instrument. If they are independent they are to be treated in all respects as though they had been written on separate pieces of paper : Lippincott *v.* Low, 18 P. F. Smith 314.

The opinion of the court was delivered, May 11th 1874, by

AGNEW, C. J.—The clear and methodical report of the master saves us the necessity of discussing many of the questions raised by the numerous assignments of error. These appeals are from the same decree, and we shall notice a few leading points which will govern the decision. The principal question arises upon the agreement between Henry W. May and Philip G. Fessler, dated September 11th 1863. That this paper is a mortgage of May's equitable interest in the land is very clear. Its terms are express. After reciting that May held the land by

[Fessler's Appeal.]

agreement, Fessler agreed to advance for May two sums of $500 and $600 to pay the purchase-money due by May to L. A. Mackey and D. Carskaddon; and then agreed "that the title of said land shall be made to the said Fessler, and be by him held until the $1100 shall be paid by the said May to the said Fessler, in saw-logs, as per terms stated in a contract for logs this day made between the parties." This language is sufficient in itself, for it distinctly exhibits the relation of debtor and creditor, and not that of vendor and vendee. This is not all, for the writing contains this express covenant: "Then (viz., on payment) the said Fessler agrees by himself, his heirs and assigns, to *convey* to the said May, his heirs or assigns, the said tract of land, free of encumbrance." Thus, by express terms, the interest of May, whatever it was, passed to Fessler as a pledge or security for money to be advanced by Fessler for May, in order to secure May's purchase of the land. Fessler was a lender of money, not a purchaser of land: Sweetzer's Appeal, 21 P. F. Smith 264; Danzeisin's Appeal, 23 P. F. Smith 65.

What interest did pass? This is equally clear. It would be sufficient on this point to rely on the report of the master confirmed by the court, the testimony being uncontradicted. But let us turn to the evidence and examine it. That Mackey and Carskaddon had a good title is not questioned. The legal title was in William Fearon, in trust for them, but he executed this trust by his conveyance of the 4th of January 1865. Mackey testifies that he gave Carskaddon full authority to treat for the sale of the land with May, and that he transacted the business. Carskaddon testifies that Mackey and he had a contract in *writing* with H. W. May for the *sale* of this tract of land, that the nature of their contract was that they agreed to *convey* the land in question to May, upon certain payments, to be made by a given time or times, the purchase-money, he thinks, was $1100. Then the legal character of the writing was perfectly clear. It was an agreement of bargain and sale, making time of essence in the payment. But making time of essence in the performance of the contract does not change the nature of the agreement itself. So long as the time had not expired the agreement to convey was legally and fully binding. Therefore, calling it a refusal, or an option, cannot change its true character. May had a right to call for a conveyance on payment according to its terms. But even if it were an option contract it was binding and enforceable, if the option be exercised according to its terms: Kerr v. Day, 2 Harris 112; Corson v. Mulvany, 13 Wright 88; Siter, James & Co.'s Appeal, 2 Casey 180; Shollenberger v. Brinton, 2 P. F. Smith 98; Lowry v. Mehaffy, 10 Watts 389; McFarson's Appeal, 1 Jones 503. But the case does not rest on the character of the writing alone; for the parties carried it into actual execution. Carskaddon testifies: "We considered the land as May's if he complied with the con-

tract. When we met at the office of Mr. Hirst it was for the purpose of carrying out this arrangement, as I understood it." May and Fessler were both present. "Our object in meeting there was for the purpose of receiving the first payment, and for the purpose of closing up the transaction." "What we were doing at the meeting in Hirst's office was in furtherance of the contract with May, as I understood it. I went there at the instance of Mr. May, for the purpose of closing up the transaction for the sale of this land." "We were all together. No one left the office until the matter was entirely closed up. I required the $100 to be paid before the contract was signed by Mr. Fessler and Mr. Mackey. I got Mr. Mackey's price for his interest, and I wanted a little more." It is further in evidence that May paid the $100. It further appears by the agreement and receipts that Fessler paid only $957.75. Thus the facts prove beyond a question that Fessler took May's place under the contract between May and Mackey and Carskaddon, and advanced the money for May by virtue of the agreement of September 11th 1863. He is estopped from denying May's title, both by his acts and by the recital in his agreement, which opens thus: "That whereas, the said H. W. May holds an agreement with L. A. Mackey and D. Carskaddon for a tract of land on Lonsbaugh run, in Cameron county." On every ground it is apparent that Fessler held the equitable title derived from Mackey and Carskaddon as a security for the money advanced by him for May. Hence, when he obtained the legal title from Fearon, the trustee of Mackey and Carskaddon, in execution of their contract, he held the land as a trustee for May under a covenant to convey to him upon the repayment of the sums advanced by him for May, according to the express terms of the agreement of September 11th 1863. This being the true relation of these parties, it puts an end to several controversies. A mortgagee is not the owner of the land, and is entitled only to his money and interest. No question of delay in filing the bill can arise. It is not a case of specific performance to which the doctrine of abandonment by laches can apply. It is not a parol trust, and is not affected by the limitation in the sixth section of the Act of 22d April 1856. Delay will be compensated by interest; and if the mortgagee be in possession, and has incurred expenses, they will be settled in his account for profits he has derived: Harper's Appeal, 14 P. F. Smith 315.

The next matter to be noticed is the saw-log contract between May and Fessler of even date, viz.: September 11th 1863, set up by Fessler in his defence. By it May agreed to cut, sell and deliver to Fessler one million or more feet (board measure) of white pine saw-logs, at $5.25 per thousand feet, in the time and manner set forth in it, and Fessler agreed to pay to May, in consideration of this $500, within twelve days from the date, and the remainder in certain instalments. The defence turns upon the interpretation

of this agreement as to the $500 to be paid in twelve days. Fessler paid but $250 of this sum. May was a poor man, according to Fessler's own showing, and without this money, according to all the evidence, was unable to prepare for the execution of the log contract, and to carry it out. It is in clear proof that May repeatedly demanded money from Fessler to go on with the contract, and offered to refund what he had received if Fessler would release the contract; but Fessler refused all offers, and both neglected and refused to pay the money. It is beyond controversy that, if Fessler was bound to pay this sum of $500 in twelve days from September 11th 1863, he was in fault, and not May, in the execution of the log contract, and therefore cannot interpose that contract as a defence to the land contract or mortgage. To avoid this he contends that this sum of $500 in the log contract is the identical sum mentioned in the land or mortgage contract which was paid, and to make good this position insists that the two agreements of September 11th 1863 are one in effect. But it is immaterial whether we call the two papers one agreement or two; they contain intrinsic evidence, corroborated also by surrounding circumstances, and cotemporaneous acts, showing that the two sums are not identical. The very reason why the parties made two distinct writings was that the purpose of each was different. The mortgage contract was to enable May to secure the land by providing for the payment of the purchase-money to Mackey and Carskaddon. The purpose of the log contract was to supply Fessler with logs and enable May to refund the money advanced. By the express terms of the mortgage agreement, Fessler agreed to make the payment of $500 *to apply on the land* in twelve days. This money was not for May himself, but for Mackey and Carskaddon to save the land upon which the logging was to be done, and so the parties mutually treated it, the money being paid in the presence of both parties. On the other hand the $500 to be paid in twelve days on the log contract, was expressed in the agreement to be in consideration of the logs to be cut and delivered by May, and was also expressed to be the first instalment of the $5.25 to be paid per thousand feet. The proof does not rest on the expressed consideration alone, but the agreement further provides that the payments on the land shall come out of the last two instalments. The payment of $500 being the first instalment, it is impossible, without violating the express language of the agreements, to say that it is one of the land payments. *Expressio unius est exclusio alterius.* This interpretation is supported also by the reason and necessity of the thing as shown in the evidence. Logging contracts such as this are prosecuted in the fall, winter and early spring, and a large outlay of money is necessary in the beginning to provide a cabin or shelter for the hands and for the team, to make roads, lay in provisions and supplies of grain, hay,

[Fessler's Appeal.]

&c.    The testimony is, that for such a contract this sum of $500 was not more than adequate; and afterwards money is required to pay wages and other current expenses. To conclude the proof, Fessler so interpreted his own contract, for in ten days, September 21st 1863, he paid one-half of this sum of $500, having already paid $475 on the land contract on the 19th of September 1863. It is very clear, therefore, that Fessler was in default on the log contract, and having repeatedly refused May's demands for money to carry on the work, Fessler cannot now set up the log contract as a defence against the mortgage.

The next matter to be noticed is the relation of Harris to the case.    On this point it is sufficient to take Harris's own answer and his testimony, without entering into the disputed question of Perry's agency and of actual notice.    According to these, when the plaintiff's bill was served on Harris, he had no title except an unexecuted bargain on which he had paid one instalment of $1000. The remaining one thousand dollars he did not pay until long afterward.    The bill was filed May 6th 1867, and served on Harris November 23d 1867, while the second thousand dollars was not paid until October 1869.    Harris relied wholly on his agreement of September 14th 1866, and set up no deed either in his answer or his testimony.    Indeed, the deed is not referred to in any part of the case.    He was, therefore, not such a bonâ fide purchaser without notice as would be protected, except to the extent of the $1000 paid before service of the bill: Youst v. Martin, 3 S. & R. 423; Union Canal Co. v. Young, 1 Wharton 410; Beck v. Ulrich, 1 Harris 636; Juvenal v. Jackson, 2 Id. 524; Coxe v. Sartwell, 9 Id. 488; Henry v. Raiman, 1 Casey 360; 2 Sugden's Ven. & Pow., 8 Am. ed. 523.    This being the *status* of Harris when the bill was filed, the legal title being still in Fessler, it was unnecessary to pray for a conveyance from Harris to May.    The prayer for an injunction against Harris and his servants to stay waste by cutting timber was the only prayer then necessary.    Had Harris set up a deed by supplemental answer, May might have amended under the Act of 4th May 1864, 1 Bright. Dig. 601, pl. 72; Danzeisin's Appeal, *supra*.    It was therefore an error to dismiss the plaintiff's bill wholly as to Harris.    The learned judge had probably not noticed the state of the case when the bill was filed, and Harris's omission to set forth any title in himself.    But in view of the report of the master, for compensation only against Harris, a prayer for a conveyance is immaterial.    In strictness a reconveyance might have been decreed by making Harris's grantees, Wells and Page, parties.    A bill in equity is *lis pendens*, of which every one is bound to take notice.    This is settled in the well-considered case of Diamond v. Lawrence County, 1 Wright 353, in which the doctrine is fully discussed and the authorities cited by Woodward, J.    Page and Wells were, therefore, not innocent pur-

[Fessler's Appeal.]

chasers without notice. But a court of equity will look to the effect of a decree, and give it such shape as will do equity, and prevent injustice. In view of the relations of Wells and Page to the case, they not being brought in as parties, and to save Harris harmless from damages at their suit, we think the decree for compensation only against Harris is the most equitable and should be approved. The master seems to have weighed the case well and arrived at a judicious conclusion.

Upon the whole case the appeal of Philip G. Fessler is dismissed, with costs of appeal to Henry W. May; and in the appeal of Henry W. May, we reverse the decree of the court below dismissing the plaintiff's bill as to N. C. Harris, and adopt the report of the master and the decree reported by him, which is hereby confirmed, except as to the time of payment, which, in the case of Philip G. Fessler, is fixed at sixty days, and in the case of N. C. Harris at four months from the time of filing this decree. The costs of this appeal to be paid by the defendant P. G. Fessler, the costs in the court below to be paid as reported by the master.

SHARSWOOD and MERCUR, JJ., dissented.